**UNITED STATES of America,
Plaintiff,**

**v.**

**Derek CAPOZZI, Defendant.**

**No. CRIM. 98–10087–PBS.**

United States District Court,
D. Massachusetts.

April 5, 2000.

Joan M. Griffin, Casner & Edwards, Matthew A. Kamholtz, Segal & Feinberg, Peter B. Krupp, Lurie & Krupp, LLP, Boston, MA, for Derek Capozzi.

Thomas C. Horgan, Boston, MA, Matthew A. Kamholtz, Segal & Feinberg, Boston, MA, for Jason Stone.

Matthew S. Robinowitz, Fitchburg, MA, for Jay Woodward.

Christopher F. Bator, United States Attorney's Office, Boston, MA, for U.S.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

Prior to trial, defendant Derek Capozzi moved on two grounds to suppress a gun and a knife discovered by police in his motel room. First, he argued that the police intentionally made material misrepresentations in the search warrant application, most significantly about the existence of an anonymous tipster. Second, he contended that the search warrant was issued without probable cause because the anonymous tip lacked sufficient corroboration. After a six day hearing, and because of the imminent trial date, I issued a brief opinion on October 22, 1999 in which I found that there was an anonymous tipster. Although concluding that the search warrant lacked probable cause because the anonymous tip had insufficient indicia of reliability, I held that the good faith exception applied. Accordingly, I *DENIED* the motion to suppress. I amplify that opinion now.

### PROCEDURAL BACKGROUND

On July 8, 1998, Derek Capozzi was indicted on charges stemming from three different incidents: a shooting in Haverhill in November of 1997; an armed bank robbery in Beverly in January of 1998; and an attempted extortion in Peabody in February of 1998. Specifically, Capozzi was charged with: being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (count 1); attempted extortion affecting commerce, in violation of 18 U.S.C. § 1951(a) (count 3); use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (count 4); armed bank robbery, in violation of 18 U.S.C. § 2113(d) (count 5); and a second count of use of a firearm during and in relation to a crime of violence, under 18 U.S.C. § 924(c) (count 6). By this Court's Order of October 22, 1999, counts three and four were severed from counts five and six. A jury trial on counts one, three,

and four, involving the Peabody incident, resulted in a conviction on all three counts on November 16, 1999. A jury trial on counts five and six, involving the Beverly bank robbery, resulted in an acquittal on February 7, 2000. At both trials, the government introduced into evidence the gun seized from the defendant's room pursuant to a warrant search on February 20, 1998.[1] After two previous unsuccessful searches, the warrant was issued based partly upon new information provided by an anonymous tipster.

Prior to the first trial, the defendant moved to suppress all fruits of that search, and moved for a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 155–156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), alleging that the affidavit supporting the search warrant contained material misrepresentations or representations made in reckless disregard of the truth. Specifically, defendant denied the existence of the anonymous tipster. The Court held a six-day evidentiary hearing, which included testimony from fourteen witnesses. After assessing the credibility of the witnesses, the Court now makes the following findings of fact.

### FINDINGS OF FACT

#### A. The Attempted Extortion and Police Response

On February 18, 1998, at about 1:17 p.m., Peabody Police received a report regarding an incident involving two males with guns at the Gardner Park Auto Sales and Brokerage Co. ("Gardner Park") located at 18 Walnut Street, at the intersection of Wallis Street and Walnut Street, in Peabody. Minutes later, police arrived at the dealership, and three eyewitnesses told them that Derek Capozzi and Jason Stone entered the dealership, where Capozzi demanded the return of $4,500 he had used to purchase a car several weeks earlier, and threatened the owner with a gun when

the owner refused his demand. Witnesses also told police that Stone had a gun sticking out of his waistband.

At some point during the confrontation, the owner left the room, purporting to answer a ringing telephone. At this point, according to witnesses, Capozzi handed his gun to Stone and Stone left the dealership. Shortly thereafter, Peabody Police Officer Richard Cochran spotted Stone walking in the direction of the dealership and observed that Stone met the description given over the dispatch. About that same time, Peabody Detective Richard Robillard arrived on the scene. Cochran and Robillard arrested Stone outside the dealership. Officer Daniel Murphy reported that he had seen Stone walking away from the Charles Motel parking lot. Capozzi was arrested inside the dealership.

In the immediate aftermath of the arrest, responding officers began to share information about Capozzi. Peabody Sergeant Michael Breen learned from Officer Cochran that Cochran had recently responded to an emergency call at Capozzi's room at the nearby Charles Motel. The Charles Motel is located at 4 Mill Street in Peabody, a short distance from the Gardner Park dealership on Walnut Street. Mill Street runs roughly parallel to Walnut Street, with a woodsy area, railroad tracks, and a waterway separating the buildings facing Walnut from the buildings facing Mill. By all estimates, it was feasible for Stone to have gone to the Charles Motel and back to the Gardner Park dealership in a matter of a few minutes.

#### B. The Initial Search of Charles Motel Room # 2

Sergeant Breen, Officer Cochran, and Peabody Officer John DeRosa then went to the Charles Motel, where they learned that Capozzi had rented Room 2 through the week of February 22, 1998. They knocked on the door at Room 2, which was opened by Erica Murphy, a blonde, who

---

1. At the first trial, the government also introduced the knife seized during the search.

Both the gun and knife are within the scope of this Court's order.

was Capozzi's girlfriend at the time. Also present in the room was Santina Luca, a companion of Stone's, who had been sleeping on a mattress in the front part of the room. Luca is a brunette. In a brief exchange, the officers explained to the two women that they were looking for guns that had just been used to commit a crime. Murphy admitted the officers, who proceeded to do a cursory search of the room. The officers did not search Murphy or Luca. After initially allowing them to look around, Murphy then indicated that since it was not her room, she would not permit them to continue to search. Having found no guns as a result of this initial search, the officers left. At this point, other officers began to arrive at the motel, including Officer Murphy and Detective Robillard. Sergeant Breen directed Officer Murphy to stand guard at the door. Murphy stood guard for up to an hour-and-a-half during which he periodically observed the two women. Breen told Detective Robillard that he intended to apply for a search warrant to search the room. Robillard told Breen that he would attempt to get Capozzi's consent to search the room. Neither Officer Murphy nor Detective Robillard was made aware of the initial search performed with the two women's consent. Police searched other areas surrounding the Charles Motel and the Gardner Park dealership, including the wooded area and railroad tracks behind the dealership. Those searches turned up nothing.

## C. The Consent Search

Robillard then drove to the Peabody Police station where Capozzi was being booked, and obtained Capozzi's consent to search the motel room. Detective Robillard, Sergeant Breen, Officer DeRosa, Officer Murphy, and approximately two other officers then searched Room 2 for about an hour. This search was far more thorough than the initial cursory search: officers searched through drawers, under mattresses, and inside food containers. No guns were found. Luca and Murphy were present throughout the search; officers

checked the women's waist areas to ensure that they were not hiding guns.

## D. The Anonymous Tip

On the following day, February 19, 1998, Capozzi and Stone were arraigned in Peabody District Court. Bail was set at fifty thousand dollars ($50,000) cash. Present at the arraignment were: Murphy and Luca; Jason Stone's mother, Sheila Hinchey; Stone's girlfriend, Sue Pszenny; Stone's sister; Mark Lessor and Jay Woodward, friends of Stone and Capozzi; and Dawn Pearson, Lessor's girlfriend. Luca and Murphy sat in front of the other group of friends and relatives, and other people were present in court to watch different cases. The owner of the Gardner Park dealership, Michael F. McGrath, was also present. While waiting for Capozzi and Stone's case to be called, Luca and Murphy made two trips to the restroom because Murphy was feeling ill. After the arraignment, Luca and Murphy walked back to the Charles Motel to collect their belongings. The other group left separately. The walk from the Charles Motel to the Peabody District Courthouse takes only a few minutes.

Later that day, while on his walking beat, Officer Murphy saw the two women (a blonde and a brunette) he recognized from the search of the motel room walking on Mill Street, near the intersection of Wallis Street. One of the women was walking a dog, and one was carrying a backpack. Officer Murphy asked the women if their friend had made bail. In response, the blonde woman (who officer Murphy believed was named "Murphy") said that they had just come from the courtroom and that Capozzi's bail had been set at $50,000. The brunette woman said that Capozzi's next court date was February 23, 1998. On the following day, Officer Murphy wrote a brief report describing his encounter with the two women, but omitted the detail that the women had told him

they had been in the courtroom at Peabody District Court that day.

That same afternoon (February 19, 1998), Sergeant Thomas Griffin of the Salem Police received an anonymous phone call while on duty in the Criminal Investigation Division of the Salem Police Department. When the female caller asked for Sergeant Conrad Prosniewski, Griffin told her that Prosniewski was no longer assigned to that division, and that he believed Prosniewski had left for the day. The caller said that she had done some work for Prosniewski in the past, and that she had information she wanted to pass on; Griffin told the caller he could take the information. The caller said that she had been present in Peabody District Court that day and had overheard two women talking about a knife and a gun that were hidden in a hotel room in Peabody. The caller overheard these women say that the police did not find the knife and gun when they searched the room because they were hidden really well, and were wrapped up in a sock. The caller further indicated that the knife and gun were used by Capozzi in an assault on a Peabody businessman the day before. The caller wished to remain anonymous.

After receiving the tip, Sergeant Griffin called the Peabody Police Department, but could not recall to whom he spoke. Though Griffin believed he spoke with either Robillard or Detective Winn, neither of those officers recalled having the conversation. Griffin called Prosniewski and described the conversation with the tipster, but Prosniewski was unable to identify the tipster. Griffin also told Salem Detective Harry Rocheville, who was seated nearby, about the tip. Rocheville, in turn, relayed the tip to F.B.I. Special Agent Gerald Mohan, who had learned of Capozzi and Stone's arrest. Mohan was investigating Capozzi's possible involvement in the Beverly bank robbery and had called Rocheville to get information about Jason Stone.

### E. Enter Trooper Irwin; The Tip Circulates

While on his way to work on February 19, 1998, Massachusetts State Police Trooper Robert Irwin learned from the media that Capozzi and Stone had been arrested following the incident at Gardner Park. Capozzi was a suspect in several investigations that Irwin was involved with at the Essex County District Attorney's Office, including the murder of a woman named Aislin Silva. Upon arriving at work, Irwin called Detective Robillard in Peabody to get the status of the Gardner Park investigation. Robillard told Irwin that officers were looking for several weapons, one of which was a large, silver/chrome-colored revolver. Robillard also told Irwin about the search made pursuant to Capozzi's consent, and of the searches of the areas surrounding the motel and dealership. Irwin offered to have the State Police Dive Team search the waterway behind the dealership. Robillard agreed, and they arranged to meet the next day.

The following day, February 20, 1998, the State Police Dive Team performed a search of the waterway behind the Gardner Park dealership. No weapons were recovered. Trooper Irwin attended the search with Sergeant Michael Cronin of the State Police. During the search, Irwin also encountered Officer Murphy, who relayed the conversation he'd had with the two women the day before. Murphy told Irwin that his encounter with the women occurred on Mill Street, and that he recognized the women as the same women who had been present at the consent search. Irwin next encountered F.B.I. Agent Mohan, who had been interviewing the owner of the dealership to get a description of the gun used by Capozzi. Mohan told Irwin about his conversation with Rocheville, including the fact that Salem detectives had received an anonymous call. Mohan recounted to Irwin that the anonymous caller indicated that she had been in Peabody District Court and overheard two young

females talking about a gun and a knife that were hidden in a sock in a hotel room. Irwin then shared the tip with Cronin.

## F. The Search Warrant

After the waterway search, Irwin, Cronin, and Mohan went to the District Attorney's Office at the Peabody District Court. Irwin began to prepare a search warrant affidavit, and asked Cronin to call Rocheville in Salem to confirm the existence of the tipster and the details of the tip. As Cronin spoke with Rocheville, he conveyed the information to Irwin. Irwin told Cronin to tell Rocheville that Irwin would call him back. Irwin then called Rocheville himself and Rocheville relayed the substance of the tip. From this point on, Irwin took no further steps to corroborate the information contained in the tip, or to ascertain the identity of the tipster. Irwin completed a search warrant affidavit, which relayed the details of the incident at the Gardner Park dealership, and then stated:

6. A check of the Charles Motel, which is a short distance from the Auto Dealership, showed that Derek Capozzi had rented room # 2. He paid cash and the room was rented through the week of February 22, 1998. Derek Capozzi gave Detective Richard Robilard [sic] of the Peabody Police Detectives, a consent to search room # 2 on February 18, 1998. A consent search was performed on room # 2 for the handguns on Wednesday, February 18. The result of the search was negative. During the search of the room, two young, blonde, white females were in the room. During the search, members of the Peabody Police noticed various articles of clothing, none containing a fire arm.

7. A search was done of the area and the results were negative. No handguns were found in the area of the Auto Dealership and the Charles Motel. Peabody PD had approximately 10 officers involved in the search. On February 20, 1998 a search was conducted of a water

way that runs near the Auto Dealership and the Charles Motel. State Police Dive Team members conducted a search for the weapons with negative results. Room # 2 was locked and Capozzi and Stone were held at the Middleton House of Correction.

8. On February 20, 1998 at approximately 1400 hours this officer was made aware of a phone call to the Salem Police Department. Detective Harry Rocheville advised that a female caller had advised that she wished to remain anonymous. She went on to say that she was in Peabody District Court on February 19, 1998, the date that Capozzi and Stone were arraigned. She heard two females discussing Capozzi's arrest. They stated, "the gun is in the room, it is well hidden in a sock, and the cops didn't find it."

9. Two females were observed in front of Peabody District Court on the afternoon of Capozzi's arraignment by Officer Daniel Murphy of the Peabody PD. Murphy reckognized [sic] the woman [sic] as being the same two females as were in the room at the Charles Motel during the consent search. The females were engaged in conversation by Murphy. They advised that they were up in the courtroom and that the bail on Capozzi was set at $50,000 dollars and that his next court date was February 23.

10. It is this officer's opinion that the defendants in this case had more than enough time to hide the handguns in the Charles Motel. The search of the area was done with negative results. Based on the handguns not being found in several extensive searches and the new information from Salem Police; this officer beleives [sic] that there is probable cause to beleive [sic] that the handguns used in the Armed Assault, on McGrath, are in room # 2 of the Charles Motel, 4 Mill Street in Peabody.

Trooper Irwin's affidavit varies from the information provided by other witnesses in a few respects. First, although Murphy

indicated to Irwin that his February 19 encounter with the two women occurred "on Mill Street," Trooper Irwin's affidavit describes the encounter as happening "in front of Peabody District Court." Peabody District Court is, in fact, on Mill Street, under two hundred feet from the parking lot of the Charles Motel. Second, although Murphy described the two women as a blonde and a brunette, Trooper Irwin mistakenly indicated in his affidavit that both women had blonde hair.

Of the omissions in Trooper Irwin's affidavit, only a few deserve mention. First, although the tip—according to Sergeant Griffin, Detective Rocheville, and Agent Mohan—contained mention of a gun *and a knife*, Trooper Irwin included only mention of the gun. Second, Rocheville recalls telling Irwin that the tipster indicated she had "done some work" for Prosniewski in the past; i.e., that she was a "source." This detail was also omitted from the affidavit. Third, Trooper Irwin's affidavit contains no mention of the initial, cursory search performed with the two women's consent. But by all accounts, Trooper Irwin was unaware of that initial search. Finally, the affidavit does not indicate that Sergeant Griffin, and not Rocheville, actually received the tip. But in his conversation with Irwin, Rocheville indicated simply that "we"—meaning the Salem detectives—received the anonymous call. Irwin therefore believed that it was Rocheville himself who received the anonymous call.

After completing the affidavit, Irwin next called Assistant District Attorney Robert Bender, an attorney with (at that time) thirteen years of experience in the Appeals Unit. Irwin asked Bender if there was a legal basis for getting a search warrant in circumstances where the Peabody Police had already searched the same place. Irwin relayed the new information, and Bender told him that he had developed enough new information and that he should seek a search warrant. Irwin then submitted his affidavit and warrant application to Clerk Magistrate Kevin F. Barry

of the Peabody District Court, who signed the warrant.

The warrant search was conducted by Trooper Irwin; Detective Lieutenant Malone of Peabody; Trooper Cronin; Detective Robillard; and Detective Eric Ricci of Peabody. Also present were Agent Mohan; Sergeant Murphy of the State Police Ballistics Section; and Trooper Lombard of the State Police Crime Services Section. The officers first found what appeared to be a small handgun, but which, upon closer inspection, was actually a knife whose handle appeared to be the butt of a handgun. The knife was found inside a square Kleenex box. Officers then found a Ruger .357 caliber handgun matching the description of the gun used by Capozzi at the dealership. The gun was found tucked inside the cloth inner lining of the spring area of the bottom of a chair. It was wrapped in a pair of boxer shorts.

## DISCUSSION

### A. The *Franks* hearing

██ Under *Franks v. Delaware,* an evidentiary hearing must be held when a defendant makes a substantial preliminary showing that a false statement, or a statement made with reckless disregard for the truth, was included by an affiant in a warrant affidavit. *See* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). The defendant bears the burden of proving perjury or reckless disregard by a preponderance of the evidence. *See id.* at 156, 98 S.Ct. 2674.

Here, a hearing was granted because the defendant offered the affidavit of Santina Luca, one of the women present during the searches of Room 2, who stated that neither she nor Ms. Murphy made the statements overheard by the tipster. On this basis, the defendant denied that the tipster existed at all. As stated in my October 22, 1999 order, while I found Ms.

Luca to be credible in many respects,[2] the testimony of at least six law enforcement officers, from local, state, and federal agencies, together with contemporaneous documentation (*See* Gov. Exh. 2, Def. Exh. 25) provides overwhelming proof that the tipster did indeed exist. Moreover, given the number of people in court on February 19, 1998, Ms. Luca's testimony does not disprove either the existence of the tipster or the substance of what the tipster overheard.

While I find that there was an anonymous tipster, one element of the tip gives me some concern. According to Sergeant Griffin of the Salem Police Department, the tipster relayed information she overheard about a gun *and a knife* used by Capozzi in a Peabody Assault. (*See* Defendant's Exh. 25). Detective Rocheville testified that he made Trooper Irwin aware of the knife component of the tip. Troopers Irwin and Cronin testified that the focus of the discussion was a gun, and they did not remember being told that the anonymous informant also mentioned a knife. Trooper Irwin did not include mention of the knife in his affidavit seeking the search warrant. While credibility disputes of this kind are difficult to resolve, I find that it is more likely true that Rocheville mentioned a gun and knife to either Cronin or Irwin (or both) because he described the tip that way to Special Agent Mohan. However, this was a situation in which several police officers were sharing information and acting quickly in order to investigate the crime and get a search warrant. The affiant, Trooper Irwin, was typing the affidavit as he received the information on a Friday afternoon. While I find Trooper Irwin may have been negligent in failing to transcribe precisely what Rocheville told him in this respect, I do not find that this was an intentional or reckless omission. *See United States v.*

*Owens,* 167 F.3d 739, 745 (1st Cir.1999) (denying defendant's claim where officer's acts amounted to no more than negligence, since "[a]llegations of negligence or innocent mistake are insufficient") (citing *Franks,* 438 U.S. at 171, 98 S.Ct. 2674).

The other alleged errors deserve only passing discussion. Defendant complains of inappropriate quotation marks and an inaccurate use of verb tenses. These are the hypertechnical criticisms which the courts have rejected as a basis for a *Franks* hearing. Any argument that such drafting errors were material is farfetched. The other alleged omission concerns the tipster's statement that she was a source for Salem Detective Conrad Prosniewski. Irwin testified that he was unaware of this fact. Rocheville remembers telling him. However, this omission is immaterial. If anything, the self-description as a former source might have inappropriately heightened the tipster's credibility. There is no evidence Irwin knew that Prosniewski could not identify the anonymous tipster.

The defendant sought to expand the *Franks* hearing, alleging two additional flaws in the affidavit: 1) Irwin's failure to disclose the existence of the initial search prior to the consent search; and 2) Irwin's alleged misrepresentation as to the scope of the search of the grounds between the motel and the used car building. The Court denied defendant's renewed motion to expand the *Franks* hearing because he had not made the required substantial threshold showing. "*Franks* provides for ... a hearing where a defendant makes 'allegations of deliberate falsehood or of reckless disregard for the truth ... accompanied by an offer of proof.'" *United States v. Procopio,* 88 F.3d 21, 26 (1st Cir.1996) (quoting *Franks,* 438 U.S. at 171, 98 S.Ct. 2674).

---

**2.** Ms. Luca was visibly nervous while testifying, however. She held a prayer card in her hands throughout her testimony. Although she denied that she was afraid of the defendant, she acknowledged that she had asked an investigator whether Capozzi would be present while she testified, and told the investigator that she was aware of press reports connecting Capozzi to the murder of a Medford woman named Aislin Silva.

As to the first issue, the defendant made no threshold showing that Irwin knew about the initial search or that it was material. The evidence showed that Irwin was not present for that search, and it was limited in scope. Moreover, Irwin made an adequate description of the second consent search, which renders the initial search largely immaterial. As to the second issue, the defendant presented no evidence to suggest that the description of the search of the grounds and the waterway was intentionally or recklessly misleading. It is worth noting that the Peabody District Court where the search warrant was issued was a stone's throw away from the motel and car dealership at issue, so the relevant places were certainly not unfamiliar.

## B. Motion to Suppress

### 1. Probable Cause

After a review of the affidavit and case law, I conclude that there was inadequate probable cause for the issuance of the search warrant, although I think it is a close call. Probable cause for the issuance of a search warrant exists where "given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). "A probable cause determination is fundamentally a fact-specific inquiry." *United States v. Khounsavanh*, 113 F.3d 279, 285 (1st Cir.1997). Reviewing courts are directed to grant "great deference" to a magistrate's evaluation of supporting affidavits. *United States v. Jewell*, 60 F.3d 20, 22 (1st Cir. 1995). Reversal is appropriate only when a court concludes that no "substantial basis" exists for concluding that probable cause existed. *Gates*, 462 U.S. at 238–39, 103 S.Ct. 2317; *see also Procopio*, 88 F.3d at 25.

■ An anonymous tip, standing alone, is generally insufficient to establish probable cause. *See Gates*, 462 U.S. at 227, 103 S.Ct. 2317. Absent information about a tipster's reliability or basis for obtaining her information, some corroboration is required. Under *Gates*, "[i]t is enough, for purposes of assessing probable cause, that corroboration through other sources of information reduce(s) the chances of a reckless or prevaricating tale .…" *Id.* at 244–45, 103 S.Ct. 2317. When some partial corroboration of an informant's tip takes place, the inquiry is "when does verification of part of the informant's story make it sufficiently likely that the crucial part of the informant's story ... is true." *Khounsavanh*, 113 F.3d at 284.

■ Against this backdrop, the Court examines Trooper Irwin's affidavit. Although the affidavit did contain multiple hearsay, this alone does not eviscerate probable cause if, through corroboration, an affidavit demonstrates sufficient indicia of reliability surrounding the tip. *See Procopio*, 88 F.3d at 26 (finding sufficient corroboration to support probable cause despite the fact that informant's tip contained multi-level hearsay); *Jones v. United States*, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960) (holding that affidavits containing hearsay are not insufficient if a substantial basis exists for crediting hearsay). In several cases, the First Circuit has considered an informant's proven record of reliability as boosting the strength of a tip. *See United States v. Schaefer*, 87 F.3d 562, 566 (1st Cir.1996) (affirming that informant's prior record of reliability may be sufficient to "bulwark an informant's report."); *United States v. Diallo*, 29 F.3d 23, 26 (1st Cir.1994) (crediting informant's information in part because the informant was known to police as reliable).

An anonymous tip, however, presents special problems. In this context, the First Circuit has looked to other indicia of reliability, such as the fact that the tipster's information was "based on personal knowledge, rather than hearsay." *United States v. Scalia*, 993 F.2d 984, 987 (1st

Cir.1993) (crediting anonymous tip due to its detail, the fact that tipster had first-hand knowledge, and where other corroboration existed); *United States v. Caggiano*, 899 F.2d 99, 102–103 (1st Cir.1990) (finding tip more reliable where details were derived from personal observation and not hearsay). But where (as here) the tipster is anonymous, and the tip is based on hearsay, rather than first-hand knowledge, the need for further corroboration is paramount.

In this context, the police must corroborate more than innocent details. *See Florida v. J.L.*, —— U.S. ——, 120 S.Ct. 1375, 1377, 146 L.Ed.2d 254 (2000) (holding that anonymous tip which provides an accurate description of a subject's readily observable location and appearance does not, without more, show that "the tipster has knowledge of concealed criminal activity"); *Khounsavanh*, 113 F.3d at 286 (finding that corroboration supplied by a controlled narcotics buy supported probable cause, where corroboration of "innocent facts" would not have); *United States v. Wilhelm*, 80 F.3d 116, 120–121 (4th Cir.1996) (finding no probable cause where officers corroborated only "innocent details" supplied by unknown tipster); *United States v. Clark*, 31 F.3d 831, 835 (9th Cir.1994) (stating that "[m]ere confirmation of innocent static details in an anonymous tip does not constitute corroboration"); *United States v. Gibson*, 928 F.2d 250, 253 (8th Cir.1991) (finding, on facts of case, that corroboration of innocent details was insufficient to establish probable cause).

Here, the corroboration provided by the police is twofold: first, that the two women, Santina Luca and Erica Murphy, who were present during the search, were also present in the Peabody District Court at exactly the same time and place described by the tipster; and second, the fact that the police had searched in vain for the gun in other possible locations in the surrounding areas and waterways. The accurate details of the crime provided by the anonymous tipster supply some corroboration, but not strong corroboration, because local press coverage the morning of the tip may have provided the information. A stronger indicia of reliability stems from the knowledge there had been an unsuccessful police search; how could the anonymous tipster have known this? While the question is close, in view of the rigorous corroboration requirements for anonymous tips, I find that the police had insufficient corroboration of the reliability of the anonymous tip. Because the tip was the primary reason the police sought re-entry after the original consent search failed, I conclude that these factors do not constitute a "substantial basis" on which a magistrate could find probable cause to reenter the motel room.

### 2. Good Faith

██ The Supreme Court has held that the exclusionary rule should not be applied when an officer conducting a search acted in objectively reasonable reliance on a warrant issued by a magistrate that is subsequently found to be invalid. *See Massachusetts v. Sheppard*, 468 U.S. 981, 988, 104 S.Ct. 3424, 3427–28, 82 L.Ed.2d 737 (1984); *United States v. Leon*, 468 U.S. 897, 922–23, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984). Where excluding evidence would not have a substantial deterrent effect on police misconduct, the Fourth Amendment rationale underlying exclusion does not exist. *See Leon*, 468 U.S. at 906, 104 S.Ct. 3405. In a good faith analysis, "[i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable cause determination." *Id.* at 923 n. 24, 104 S.Ct. 3405. The government bears the burden of demonstrating good faith. *See United States v. Vigeant*, 176 F.3d 565, 571 (1st Cir. 1999).

The First Circuit has discussed four situations in which the *Leon* good faith exception is inapplicable:

1) when the magistrate ... was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; 2) where the issuing magistrate wholly abandoned his [detached and neutral] judicial role; 3) where the affidavit is so lacking in probable cause as to render official belief in its existence entirely unreasonable; and 4) where a warrant is so facially deficient—i.e. in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*United States v. Owens,* 167 F.3d 739, 745 (1st Cir.1999) (internal quotations omitted). Since I find that none of these four situations applies here, the weapons seized during the warrant search were properly admitted.

Only the first and third exclusions are in any way applicable to this case. As to the first exclusion, this is essentially a formulation of the *Franks* doctrine, and as I concluded above, defendant has not shown that there were intentional or reckless falsehoods or omissions in this case.

■ The third exclusion warrants a more focused discussion. Defendant contends that Trooper Irwin's affidavit was so lacking in probable cause that no reasonable officer could have believed that the warrant issued was valid. Put slightly differently, defendant urges us to find that "a reasonably well-trained officer ... would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Vigeant,* 176 F.3d at 571 (quoting *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092,

89 L.Ed.2d 271 (1986)). Defendant's argument fails.

Given all the circumstances under which he sought the warrant, Trooper Irwin's actions and his reliance on the warrant's validity were objectively reasonable. *See United States v. Ricciardelli,* 998 F.2d 8, 15 (1st Cir.1993) (directing the court to examine "all the attendant circumstances" in determining whether an officer should have known that a search was illegal despite a magistrate's authorization). In many respects, this case closely parallels *United States v. Gibson,* 928 F.2d 250, 253 (8th Cir.1991). In *Gibson,* the officer corroborated only a set of innocent details supplied by an anonymous caller—including the name, address, and physical description of the person described by the caller; the types of cars the caller indicated the person owned; and the fact that the house described by the caller did in fact have a basement. *See id.* at 252. While finding that this corroboration fell short of establishing probable cause, the court found that the officer's reliance on the warrant was reasonable, stating: "Ordinarily, a police officer cannot be expected to question a judge's probable cause determination." *Id.* at 253.

Here, Trooper Irwin relied not only on the authorization of the Clerk Magistrate, but also on the go-ahead of an experienced Assistant District Attorney.[3] Irwin also had a reasonable basis for believing the gun was not in the area surrounding the crime scene or hotel because of the continuing police water search after the unsuccessful consent search. Although *Leon's* objective standard "requires officers to have a reasonable knowledge of what the law prohibits," 468 U.S. at 919 n. 20, 104 S.Ct. 3405, Trooper Irwin was faced with an unfamiliar search scenario and had good reason to rely on the authorization provided by two different people

**3.** Although the Assistant District Attorney remembered the phone call, his memory of the substance of the conversation was muddy. For example, he remembered a discussion about informants (plural) who had first-hand information, but this contradicts virtually all the other testimony and documentary evidence. I find Trooper Irwin's memory as to what he told the ADA more accurate.

with legal expertise. *See United States v. Edwards,* 798 F.2d 686, 691 (4th Cir.1986) (finding that it was objectively reasonable for officers to believe that any potential flaws in warrant were cured by their consultation with the issuing judge); *but cf. United States v. Leake,* 998 F.2d 1359, 1367 (6th Cir.1993) (denying the good faith exception where an officer testified that he was aware he needed further corroboration of anonymous tip, but applied for a warrant nonetheless).

Moreover, the affidavit in this case was more than a "bare bones" recitation of conclusory allegations. *See Leon,* 468 U.S. at 923 n. 24, 104 S.Ct. 3405 (distinguishing cases in which an officer obtains an affidavit on the basis of a "bare bones" affidavit). "An affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare bones' affidavit." *United States v. Weaver,* 99 F.3d 1372, 1378 (6th Cir.1996); *see also Leon,* 468 U.S. at 926, 104 S.Ct. 3405; *Aguilar v. Texas,* 378 U.S. 108, 109, 84 S.Ct. 1509, 1511, 12 L.Ed.2d 723 (1964); *Leake,* 998 F.2d at 1367 (disagreeing with the lower court that an affidavit detailing an anonymous tip and an officer's unsuccessful surveillance of target residence was "bare bones"). Here, Trooper Irwin provided most of the details available to him (with the notable exception of the "knife" component of the tip), including: a description of the crime; the officers' failed attempts to find the gun; the conversation with Officer Murphy that placed the two women from the search in the courtroom during the relevant time; and the source and substance of the anonymous tip, which included knowledge of the crime and a prior police search. The other omissions, of which defendant attempts to make much, were either unknown to Trooper Irwin at the time or were wholly immaterial.

Finally, I find that Trooper Irwin did not misrepresent the nature or character of his sources of information to either the A.D.A. or the Clerk Magistrate, and at all times acted in good faith to comply with the law. In *United States v. Wilhelm,* 80 F.3d 116 (4th Cir.1996), the court rejected the government's good faith argument where the affidavit supporting the warrant contained wholly unsupported information from an anonymous tipster. In that case, the officers had corroborated only the directions the informant supplied to the suspect's house. *See id.* at 121. In *Wilhelm,* however, officers attempted to buttress a weak affidavit by describing the informant as "reliable," "mature," and a "concerned citizen" without a basis for doing so. *See id.; see also United States v. Baxter,* 889 F.2d 731, 733 (6th Cir.1989) (rejecting a *Leon* argument where the officers made a "knowing misstatement about the nature of the informant" that fell short of a "reckless falsehood"). Here, although defendant makes objections to the verb tenses and punctuation in the affidavit, it cannot be said that Trooper Irwin tried to make the source of the tip information anything other than what it was: an anonymous tip based on hearsay that had been relayed to him second-hand. In fact, Trooper Irwin (inadvertently, I assume) somewhat weakened the tip by omitting the unconfirmed detail that the caller had previously been used as a source by Detective Prosniewski.

One last factor should be considered. These officers were acting under significant time pressure, working to complete a warrant application on a Friday afternoon in order to seek a magistrate's authorization to find critical evidence. That evidence, they believed, was inside a motel room rented by the week and paid for in cash. *See Leon,* 468 U.S. at 914, 104 S.Ct. 3405; *United States v. Weber,* 923 F.2d 1338, 1346 (9th Cir.1990) (considering the time pressure under which officer was operating as one relevant factor in determining reasonableness). This factor is relevant in considering the reasonableness of the officers' actions in a rushed crime-solving atmosphere.

## *ORDER*

Because the officers in this case acted in objectively reasonable reliance on a search warrant, I *DENY* Defendant's motion to suppress the gun and knife seized during the February 20, 1998 search.