UNITED STATES of America

v.

John B. STEWART, Defendant.

Crim. No. 01–62–P–C.

United States District Court,
D. Maine.

Jan. 25, 2002.

---

**94**

fendant John B. Stewart's home. The agents conducted the searches of Defendant's home approximately one month apart, on June 18, 2001, and July 12, 2001. Now before the Court is Defendant's Omnibus Motion (Docket No. 9) that requests, among other things, a *Franks* hearing, suppression of physical evidence seized at Defendant's residence.[1] The Court held evidentiary hearings on these issues on September 28 and October 24, 2001. In his motion, Defendant contends that the affidavits presented to the reviewing judges in application for both search warrants were deficient in that they omitted some negative facts about the individuals providing information contained in the affidavits and that the affidavits failed to establish the confidential informants' reliability. The Government agreed that the Court should hold a *Franks* hearing, but opposes the suppression of any of the evidence seized.

Bruce M. Merrill, Portland, ME, Philip S. Cohen, Waldoboro, ME, for John Stewart.

Jonathan R. Chapman, Evan Roth, Office of the U.S. Attorney, Portland, ME, for U.S.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, District Judge.

In this case, the agents applied for, and were issued, two search warrants for De-

## I. FIRST SEARCH WARRANT

### A. Facts Relevant to June Search Warrant Application

Carl Creamer was stopped and arrested on April 2, 2001, while in possession of ten ounces of cocaine and a loaded handgun. Tr. 1 at 6.[2] The stop and arrest occurred after Creamer's physician called the police reporting that he believed that Creamer was in possession of a firearm and had threatened to kill his wife. Tr. 1 at 7, 19–21. In addition, Creamer's physician told police that he believed that Creamer was "psychotic." Tr. 1 at 19. After apprehending Creamer, state police were suffi-

---

1. In addition, Defendant's original motion asserts that any post-arrest statements he made should be suppressed. *See* Memorandum in Support of Defendant's Pre–Trial Motions (Docket No. 9) at 17–20. Defendant withdrew this claim in his reply brief. *See* Defendant's Letter Reply (Docket No. 19) n. 1.

2. Citations to the transcript of the September 28, 2001, hearing will be designated as "Tr. 1" and citations to the October 24, 2001, hearing will be designated as "Tr. 2."

ciently concerned about Creamer's mental health that, instead of taking Creamer to jail, they took him to Southern Maine Medical Center. Tr. 1 at 8. Creamer remained in the psychiatric unit of Southern Maine Medical Center for ten days.

Agent William Deetjen, a special agent with the Maine Drug Enforcement Agency ("MDEA"), received the initial referral concerning Creamer (a.k.a. "CI 2202") from the Maine State Police on April 2. Tr. 1 at 6. Hospital personnel informed Deetjen that Creamer was to be released on April 12, 2001. Tr. 1 at 9. On April 12, 2001, Deetjen and his supervisor went to the hospital and met with the psychiatric nurse, who introduced Deetjen to Creamer. Tr. 1 at 11. Deetjen asked Creamer how he was doing, and Creamer responded "that he was excellent, that he wanted to move on with his life, to cooperate with law enforcement relating to his charges." Tr. 1 at 11. Deetjen placed Creamer under arrest on the April 2 drug trafficking charge, took custody of Creamer's prescribed medication, and placed Creamer in the police vehicle. Tr. 1 at 12. There, Creamer repeated that he wanted to cooperate with the agents and identify the source of the ten ounces of cocaine. Tr. 1 at 12. Deetjen advised Creamer of his *Miranda* rights, and Creamer acknowledged that he understood them and signed a waiver form. Tr. 1 at 13. Deetjen drove Creamer to the nearby MDEA office, where he conducted an interview. Tr. 1 at 13. Asked to describe his conversations with Creamer, Deetjen testified:

> I don't believe I had any problem understanding him. He was rational, he made sense to me, and he was very articulate as to the historical cocaine, his use of the cocaine, his introduction to cocaine. We

talked about his family, his marriage. I didn't have any problems with him at all. I thought he was rational and mentally stable.

Tr. 1 at 14. During the interview, Creamer identified Stewart as his source of cocaine. Tr. 1 at 30. Following the interview, Deetjen transported Creamer to the jail. Tr. 1 at 15.

As of April 12, 2001, George Connick was the supervisor of the MDEA office that covers the Rockland area and was leading the investigation into the activities of Defendant Stewart. Shortly after his interview with Creamer, Deetjen called Connick and told him that he had arrested Creamer, that Creamer was cooperating, and that Creamer had provided information about drug activities in the Rockland area. Tr. 1 at 14, 38. In making that referral to Connick, Deetjen testified that he told Connick only that Creamer had been arrested in possession of ten ounces of cocaine and a gun and that Creamer had been released from the hospital, but he did not give Connick any specific information regarding the reason for Creamer's hospitalization.[3] Tr. 1 at 16, 59. At some point, Connick read the transcript of the doctor's phone call informing police that the doctor believed Creamer to be "psychotic." Tr. 1 at 59.

Connick assigned MDEA Agent James Pease to interview Creamer at the York County Jail. Pease was the case agent on the drug investigation already underway with respect to Stewart's activities. On April 13, 2001, Pease conducted an interview with Creamer. Tr. 2 at 41; Tr. 1 at 38. At the time he interviewed Creamer, Pease was aware that he had been hospitalized at a psychiatric facility. Tr. 2 at 40–41. Pease obtained a post-*Miranda*

---

**3.** Deetjen told him on April 12 that Creamer's hospitalization was related to some kind of mental problem, but Connick testified that he

believed that it was "a cocaine induced situation, he was heavily using drugs, low on meds ...." Tr. 1 at 60, 62.

statement from Creamer. Tr. 1 at 38. Pease had prepared a search warrant affidavit for Defendant's home, but he never included any information about Creamer's psychiatric hospitalization. Def. Exs. 8 and 10. Creamer was subsequently admitted to bail. Tr. 1 at 40. Two weeks later, on April 27, 2001, Connick met with Creamer, an attorney for Creamer, a DEA agent, and a prosecutor for a proffer interview session. Tr. 1 at 39. Connick described Creamer's demeanor at the proffer session as follows: "Mr. Creamer was very lucid, very cooperative and basically we went over everything in the [two previous] interviews and if there was anything else that he had to add as far as collaborating." Tr. 1 at 39. Connick continued: "He seemed to have his wits about him. There was no confusion that I could see when he spoke about the particular people that he dealt with, that he was selling or buying cocaine, he was very detailed in regards [sic] to giving addresses and people's names." Tr. 1 at 40. Nevertheless, after the proffer session, Connick decided not to actively use Creamer to work on drug investigations. Tr. 1 at 41. Connick stated that his reasons for that decision were related to the potential for violence suggested by Creamer's April 2 arrest and firearm seizure, Creamer's recent hospitalization, and the fact that Creamer was on medication.[4] Tr. 1 at 41–42. Connick's plan at that time was to stay in contact with Creamer and continue to evaluate his suitability to work as an active informant. Tr. 1 at 41.

Sometime in the late May 2001, Pease returned to his employment at the Rockland Police Department and Agent Lowell Woodman took over as the case agent on the Stewart investigation.[5] Tr. 2 at 14. On the night of May 27, 2001, the Knox County Sheriff's Department notified Woodman that Creamer had been arrested for Operating Under the Influence ("OUI") and marijuana possession. Tr. 1 at 113. Woodman never disclosed this information to Connick or other members of the Stewart investigation team. In the meantime, Connick had been having regular telephone contact with Creamer. Tr. 1 at 42–44. Between April 27 and June 13, Connick observed that Creamer was "very lucid, more so as time went on. He was back [together] with his wife, getting his business back into running shape and getting into the lobster business. Basically, every time I talked with him, things were better for him, much more, and stable." Tr. 1 at 43. Because of these improvements, Connick made the decision, on June 13, to document Creamer as an active informant and to have him attempt to make a controlled purchase of cocaine from Stewart. Tr. 1 at 44.

On June 15, 2001, Creamer participated in a controlled buy of cocaine from Stewart at Stewart's residence. Tr. 1 at 45–46. Woodman monitored that transaction via a body wire Creamer wore and recorded the transaction in which Creamer purchased cocaine. Tr. 1 at 101. Woodman heard Stewart state that he would have ten or more ounces of cocaine available for sale on June 18. Tr. 1 at 101–02; Govt. Ex. 1A, ¶ 17. Following the transaction, Creamer described the deal to Woodman and his description matched what Wood-

---

4. During this time, Creamer was being treated for cancer of the throat. Tr. 1 at 72. It is not clear whether the medication that concerned Connick was related to Creamer's throat cancer treatment or the stabilization of Creamer's mental health.

5. The record discloses that Woodman had already been actively involved in the Stewart investigation and monitored controlled drug buys from Stewart for at least four months before he took over as case agent. Govt. Ex. 1A.

man had heard over the body wire. Tr. 1 at 104.

After Creamer's controlled purchase from Stewart, Woodman began to finalize the search warrant affidavit originally drafted by Pease earlier in the spring. Tr. 1 at 46. The draft affidavit included information received from Karen York (a.k.a. "CI 2151"). York began cooperating with MDEA shortly after her arrest by the Rockland Police Department on January 22, 2001, on drug possession charges. Pease knew sometime in February 2001, shortly after York began cooperating in this investigation, that York had been arrested and charged with a drug-related crime in Rhode Island in November 2000. Tr. 2 at 33–35. Pease did not have anything in writing about the Rhode Island arrest because it had not shown up in York's criminal history check, but York admitted in an interview with Pease that she had been recently charged with a drug offense in Rhode Island. Tr. 2 at 34–35. Pease testified that he discussed York's Rhode Island arrest with both Connick and Maine Assistant Attorney General Lara Nomani. Tr. 2 at 36.

After Creamer's June 15 controlled purchase, Woodman began to finalize Pease's draft affidavit. To the draft, Woodman added Creamer's June 15 controlled purchase of cocaine. Although Woodman recited that Creamer had been arrested on drug and firearm charges, the affidavit did not include Creamer's psychiatric hospitalization or his OUI/marijuana possession arrest. Woodman changed the references from "I" to "Agent Pease" in the draft affidavit. The information about York's Rhode Island arrest was never included in Pease's draft affidavits. Pease's draft affidavits included information about the drug charges that led to York's cooperation. The affidavit also included information about York's three controlled purchases

from Stewart in January, February, and March 2001.

Once Woodman had the affidavit in final draft form, Connick reviewed it and then Nomani reviewed it. Tr. 1 at 47. Neither Connick nor Nomani requested that Woodman include any additional information in his affidavit. On June 17, 2001, Agent Woodman submitted his affidavit in support of a daytime search warrant. Govt. Ex. 1A. Based on Agent Woodman's affidavit, a Maine District Court judge issued a search warrant permitting officers to search Defendant's residence. Govt. Ex. 1B. That search warrant was executed on June 18, 2001. Govt. Ex. 1C.

### B. Analysis

Defendant argues that the fruits of the June 18, 2001, search should be suppressed because the Government failed to include the information regarding Creamer's mental health related hospitalization, Creamer's May 27, 2001, arrest for OUI and possession of marijuana, and York's November 2000 arrest in Rhode Island on drug charges. The Government responds that Defendant has not established that the evidence was intentionally or recklessly omitted. In the alternative, the Government argues that even if the Court finds that the information was intentionally or recklessly omitted and should have been included in Agent Woodman's affidavit, the inclusion of such evidence would not have made a difference to the probable cause determination.

*Franks* establishes a two-step procedure to be followed when a defendant makes a claim that a search warrant affidavit contains a false statement or material omission. *See Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). First, the defendant must make a substantial preliminary showing that the affidavit contains an intentional or reckless falsehood or omission. If the de-

fendant does so, the court must hold a hearing. At such hearing, the defendant bears the burden of proving, by a preponderance of the evidence, that the allegations regarding the false statements are true. *See id.* at 156, 98 S.Ct. at 2676. Under *Franks*, however, even if the Court finds that the affiant made an intentional or reckless omission, suppression is not appropriate unless the defendant also proves that the omitted information, if included, would have made a difference to the probable cause determination. *Id.* "When a defendant offers proof of an omission, 'the issue is whether, even had the omitted statements been included in the affidavit, there was still probable cause to issue the warrant.'" *United States v. Higgins*, 995 F.2d 1, 3 (1st Cir.1993) (quoting *United States v. Rumney*, 867 F.2d 714, 720–21 (1st Cir.), *cert. denied*, 491 U.S. 908, 109 S.Ct. 3194, 105 L.Ed.2d 702 (1989)). This is the so-called "materiality" component of the *Franks* inquiry. An intentional or reckless misstatement warrants the suppression of evidence only if it is a material misstatement. *See Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85; *see also United States v. Charles*, 213 F.3d 10, 24 (1st Cir.2000). A falsehood is material if it was necessary to the determination of probable cause. *Id.*

### 1. Creamer's Hospitalization

Many of the agents involved in this investigation were aware of Creamer's hospitalization for mental health reasons. Deetjen was familiar with the details of the events that led to Creamer being taken to Southern Maine Medical Center and Creamer's associated mental health issues.[6] In addition, prior to Creamer's discharge from Southern Maine Medical Center, Deetjen talked to hospital personnel about Creamer and then, after Creamer was discharged, Deetjen interviewed Creamer. Deetjen informed Pease of Creamer's psychiatric hospitalization and the reasons for that ten-day commitment. Tr. 2 at 40–41. After interviewing Creamer on April 13, 2001, Pease told Connick of the reason for Creamer's hospitalization. Tr. 2 at 41–42. Connick was already aware that Creamer had been arrested and hospitalized in the psychiatric unit of the Southern Maine Medical Center.[7] Tr. 1 at 23–25; Tr. 2 at 42. Pease also testified that he told Assistant Attorney General Lara Nomani of Creamer's hospitalization for mental health reasons. Tr. at 42–43. Although Nomani had been consulting

---

6. Although the MDEA report written by Deetjen after debriefing Creamer states that Creamer was arrested at Southern Maine Medical Center, the report never mentions the circumstances of Creamer's arrest or the reasons for his hospitalization. Def. Ex. 1.

7. Although Connick initially denied knowing that Creamer was hospitalized in the psychiatric unit, Tr. 1 at 59, he later admitted that he understood from reading the transcript of the call made to state police by Creamer's treating physician that Creamer was hospitalized because he was "heavily using drugs [and] low on meds." Tr. 1 at 62–63. Moreover, he stated that he knew, after talking to Deetjen on April 12, that Creamer was hospitalized for psychiatric reasons. Tr. 1 at 60. When asked why the affidavit did not contain any reference to Creamer's mental health problems or hospitalization, Connick testified that it was "[v]irtually a non-issue as far as I was concerned. Mr. Creamer had been totally cooperative, every step of the way. He followed instructions as far as I requested him to call me at my office or to be at the phone at a certain time where I could call him. He seemed very stable, he had re-entered his life after using cocaine. It really was a non-issue." Tr. 1 at 48–49. The Court doubts Connick's explanation that the psychiatric nature of the hospital admission was a "non-issue" given that Creamer's psychiatric hospitalization was part of the reason Connick originally decided not to actively employ Creamer as an informant. Tr. 1 at 42.

with the agents on the Stewart investigation for months, had reviewed several drafts of Pease's search warrant application affidavit, and knew of Creamer's arrest for drug trafficking, she denied any knowledge of Creamer's hospitalization.[8] Tr. 2 at 10–13, 16, 17, 20; Def. Exs. 8 and 10.

Although in late May Woodman became the case agent, Pease was still actively involved in the investigation of Stewart. Pease had regular contact with Woodman wherein he passed along relevant information about the investigation. Tr. 2 at 43. Agent Woodman, the affiant on the first search warrant affidavit, understood that Creamer's April 2 arrest was precipitated by a doctor's phone call stating that Creamer had a gun and was heading to Florida to find his wife. Tr. 1 at 97. He further knew that the police had seized ten ounces of cocaine, a gun and cash. Tr. 1 at 97. Woodman testified that although he was aware of Creamer's hospitalization, he did not know the details and assumed that it was related to Creamer's tracheotomy and cancer treatment. Tr. 1 at 97. On the advice of Nomani and Connick, Woodman made additional changes in the affidavit to include information about Creamer's arrest in April 2001 and the nature of the charges that resulted from that arrest. Tr. 2 at 20; Govt. Ex. 1A, ¶ 15. There is nothing, however, in Woodman's affidavit regarding Creamer's threats to kill his wife or his ten-day psychiatric hospitalization.

■ Without question, the information regarding Creamer's hospitalization should have been included in Woodman's search warrant application affidavit. Creamer's hospitalization lasted for ten days—not an insignificant amount of time—and it had occurred only two months before Creamer was activated as an informant for the MDEA and participated in a controlled purchase of cocaine from Stewart. The information regarding Creamer's psychiatric hospitalization is certainly relevant to any determination regarding his credibility as an informant. It was information that, at least, Connick, Pease, and Deetjen had prior to the submission of Woodman's affidavit. Indeed, Connick testified that his reasons for not activating Creamer as an informant earlier included the potential for violence suggested by Creamer's April 2 arrest and firearm seizure, Creamer's recent hospitalization, and the fact that Creamer was on medication. Tr. 1 at 41–42. Six weeks later, none of the facts that had informed Connick in making his decision whether to use Creamer as an informant were disclosed to the reviewing judicial officer. Such information should have been included in Pease's draft affidavit in the first instance. If that had occurred, the information would have been transferred to Woodman after he took over the investigation, and that would have increased the likelihood that the information would have ultimately found its way to the judge who reviewed the June search warrant application. Given these facts, it was, at least, reckless for the agents not to include such information in Woodman's search warrant affidavit.

## 2. Creamer's Arrest for OUI and Marijuana Possession

■ Although the record indicates that none of the other individuals familiar with this investigation—Pease, Connick, or Nomani—had knowledge of Creamer's May

---

**8.** None of the draft affidavits authored by Pease include information regarding the events, which lead to Creamer's arrest or hospitalization. Def. Exs. 8 and 10. It is not necessary for the Court to resolve this conflict in the testimony regarding whether Nomani was aware of the reason for Creamer's hospitalization.

arrest for OUI and marijuana possession, Woodman was clearly aware of this information. Tr. 1 at 112–14; Tr. 2 at 17. The Knox County Sheriff's Department notified Woodman on the night of Creamer's arrest of the new charges Creamer faced. Tr. 1 at 112–14. Moreover, Woodman was already aware that "there was a question about using [Creamer] actively for active participation in undercover buys." Tr. 1 at 98. Indeed, Connick had been keeping in contact with Creamer over a six-week period to determine if Creamer had shown signs of stabilizing his life. Because of the improvement that Connick thought Creamer had made, Creamer was commissioned, as an active informant, to have him attempt to make a controlled purchase from Stewart. Tr. 1 at 44. Even after Creamer was activated, Woodman still failed to inform the other members of the investigation about Creamer's May arrest.

Creamer's May arrest is a fact that undoubtedly detracts from his credibility. This is so despite the fact that the arrest occurred before Creamer was activated as an informant. Tr. 1 at 44, 46. Given the issue about Creamer's reliability and the relatively brief passage of time between Creamer's arrest for OUI and marijuana possession and his participation as an informant, there is no question that such information should have been included in Woodman's affidavit. The Court finds that Woodman's omission of this information from his affidavit was, at least, reckless.

### 3. York's Rhode Island Drug Arrest

Pease became aware sometime in February 2001, shortly after York began cooperating in this investigation and participating in controlled buys, that York had been arrested and charged with a drug-related crime in November 2000.[9] Tr. 2 at 33–35. Pease testified that he discussed York's Rhode Island arrest with both Nomani and Connick.[10] Tr. 2 at 36. The information about York's Rhode Island arrest was never included in Pease's draft affidavits. Def. Exs. 8 and 10.

■ This information about York's recent drug crime is highly relevant to the assessment of York's credibility as an informant. Pease obtained this information not from some unreliable source, but from a probation officer who knew York was being transferred from Rhode Island to Maine for supervision as well as from York's own admission regarding the charge. Tr. 2 at 34. Notwithstanding the lack of written documentation, Pease had trustworthy information bearing on the credibility of a cooperating individual who was heavily involved in undercover purchases of cocaine during this investigation. Such information should have been included in Pease's draft affidavit. If that had occurred, the information would have been transferred to Woodman after he took over the investigation and that would have increased the likelihood that the information would have ultimately found its way to the judge who reviewed the June search warrant application. The Court concludes

---

9. Pease did not have anything in writing about the Rhode Island arrest, but Pease testified that York admitted in an interview with him that she had been recently charged with a drug offense in Rhode Island. Tr. 2 at 34–35.

10. The record indicates that Connick and Nomani did not recall Pease telling them of York's Rhode Island arrest. Connick testified

that he was not aware of York's previous drug arrest in Rhode Island until after the execution of the second search warrant when he ran a second criminal history check. Tr. 1 at 50, 84. Nomani testified that she was not aware that York had any drug charges pending in Rhode Island in November 2000. Tr. 2 at 8.

that it was reckless for Pease not to include the additional information relating to York's criminal history in his draft affidavit.

### 4. Probable Cause in June Search Warrant Application

Defendant argues that Woodman's affidavit is fatally flawed because it does not provide any corroboration for either the reliability of the informant or the basis for the informant's information. The Government responds that even with the inclusion of the negative facts about Creamer and York the information in the first search warrant affidavit is sufficiently corroborated to establish the reliability of the informants and supports the issuance of the search warrant.

 "Probable cause exists when 'the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it' " or that the search will turn up contraband. *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir.1996) (quoting *United States v. Aguirre*, 839 F.2d 854, 857–58 (1st Cir.1988)). An affidavit supporting a request for a search warrant must give the reviewing judge a "substantial basis" upon which to conclude that there is such a "fair probability." *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983). The Court of Appeals for the First Circuit has provided a nonexhaustive list of possible factors that a magistrate or reviewing court will consider as contributing to a "probable cause" determination. Those factors include:

> whether an affidavit supports the probable " 'veracity' or 'basis of knowledge' of persons supplying hearsay information"; whether informant statements are self-authenticating; whether some or all the informant's factual statements were corroborated wherever reasonable and practicable (*e.g.*, through police surveillance); and whether a law-enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience or expertise.

*United States v. Zayas–Diaz*, 95 F.3d 105, 111 (1st Cir.1996) (citations and footnote omitted). Because "[n]one of these factors is indispensable ... stronger evidence on one or more factors may compensate for a weaker or deficient showing on another." *Id.*

 Part of the basis for probable cause in this case developed as a result of information that the agents obtained from confidential informants. When an affidavit relies on the reports of unnamed informants, it must include some information by which the reviewing judge can assess the credibility of the information those informants provide. *See United States v. Capozzi*, 91 F.Supp.2d 423, 431 (D.Mass. 2000) (citing *Gates*, 462 U.S. at 227, 103 S.Ct. 2317, 76 L.Ed.2d 527). It is not necessary for a warrant affidavit to state an informant's previous reliability; rather the appropriate inquiry is whether the informant's present information is truthful or reliable. *See United States v. Harris*, 403 U.S. 573, 581–82, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971). The informant's "veracity," "reliability," and "basis of knowledge" are all relevant to determining whether a tip provides an adequate basis for a finding of probable cause. *United States v. Khounsavanh*, 113 F.3d 279, 284 (1st Cir.1997) (citing *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328). An agent's personal assessment of an informant's reliability does not by itself provide an adequate basis for a finding of probable cause. *See Gates*, 462 U.S. at 239, 103 S.Ct. at 2332–

33; *see also United States v. Taylor*, 985 F.2d 3, 5 (1st Cir.1993).

 The information in Woodman's affidavit falls into two categories: the four controlled buys over the previous five months and the historical information regarding Stewart's drug trafficking dating back to 1997. Govt. Ex. 1A. The Court will discuss each category of information separately. With respect to the controlled buys from Defendant, both York and Creamer had drug charges pending when they participated in the controlled buys. Although both hoped that they would receive some consideration on the pending charges in exchange for their cooperation in this investigation, Woodman's affidavit provided that no promises were made to either York or Creamer. Govt. Ex. 1A. By their nature, controlled buys provide the participating informant with personal knowledge of an individual's drug activities. The fact that the informant's knowledge was based upon personal observation rather than hearsay is an important indicia of reliability. *See Harris*, 403 U.S. at 581, 91 S.Ct. at 2081; *see also United States v. Ciampa*, 793 F.2d 19, 24 (1st Cir.1986). Woodman's affidavit established that York and Creamer each gained personal knowledge of Stewart's illegal drug activities through their participation in the controlled purchases of cocaine. After each controlled buy, York and Creamer described to the agents the location, packaging, and amount of drugs present in Stewart's home. These details provided fundamental support for the informant's capacity to convey reliable intelligence relating to Defendant's criminal activity. In addition, the controlled buys were monitored by agents who, on each occasion, heard evidence consistent with the drug transaction. Most significantly, on June 15 Woodman listened via a body wire as Stewart sold one ounce of cocaine to Creamer. During the course of that drug deal, Woodman heard Stewart tell Creamer that Stewart would have "plenty" of cocaine available on June 18. Tr. 1 at 101–02. This evidence does not rely upon Creamer's credibility because Woodman heard Stewart's statements via electronic monitor. In addition, evidence of York's three controlled purchases in January, February, and March of 2001 were monitored; and they provided corroboration of the June 15 evidence and further supported the conclusion that Stewart would probably have drugs in his house on June 18.

 Finally, intelligence information included in Woodman's affidavit from five independent sources, dating back to 1997, linked Stewart to cocaine trafficking. Govt. Ex. 1A. Three of these sources were concerned citizens and, as such, the information provided by them has particular value in the probable cause equation. *See United States v. Scalia*, 993 F.2d 984, 987 (1st Cir.1993); *United States v. Campbell*, 732 F.2d 1017, 1019 (1st Cir.1984). From this information, it is probable that Stewart had been a well-established cocaine trafficker for several years. Considering the information presented in Woodman's affidavit, even in light of the information about Creamer's hospitalization, the May arrest and York's additional criminal history, the Court concludes that the warrant affidavit provides probable cause to support the issuance of the June search warrant.

The Court has found that these experienced agents recklessly failed to include the relevant information about Creamer's psychiatric hospitalization, the information about Creamer's arrest for OUI and marijuana possession, and York's known criminal history in Woodman's June 17 affidavit in application for the warrant to search Defendant's residence. The record does

not disclose that there was any collusion, or concerted effort, by the agents to conceal any of the omitted information. There was, nevertheless, a clear failure to communicate information to all of the agents involved in the investigation. When, as is the norm, a number of agents are involved in an investigation, communication of all information relevant to confidential informants is paramount to the full and accurate disclosure of the facts bearing on the probable cause determination.

## II. SECOND SEARCH WARRANT

### A. Facts Relevant to July Search Warrant Application

When Woodman and the other agents executed the search warrant on Stewart's house on June 18, they found Karen York inside. Tr. 1 at 52. At that time, York was an MDEA informant and had provided corroborating information that supported the existence of probable cause for the June 18 search warrant. Tr. 1 at 51. The agents had not given York permission to have contact with Stewart on June 18, and such contact violated the terms of her confidential informant agreement with MDEA. Tr. 1 at 52. To make matters worse, York was in possession of one gram of cocaine, which she denied belonged to her. Tr. 1 at 52. After discovering York in possession of cocaine at Defendant's house on June 18, the MDEA charged her with drug possession and discontinued her as an active informant to purchase cocaine. Tr. 1 at 52. However, the agents decided that they would continue to receive drug information from York if she were to provide it. Tr. 1 at 53.

In the days leading up to July 11, York provided information about Stewart's drug trafficking. Woodman included that information in the second search warrant affidavit, omitting, however, the information about York's presence at Defendant's home during the execution of the first search warrant, the violation of her cooperation agreement, and her possession of cocaine. Tr. 1 at 54. Assistant Attorney General Nomani testified that she was aware that York was found in possession of cocaine at Stewart's residence during the execution of the first search warrant. Tr. 2 at 22–24; Tr. 1 at 135. In fact, Nomani had a discussion with Connick about whether to include this information about York in the affidavit, and Nomani advised Connick that the information did not need to be included. Tr. 2 at 23–24, Tr. 1 at 54. In addition, although Woodman was then aware of York's Rhode Island drug charges, he also failed to include that information in his July affidavit. Tr. 1 at 131.

On July 11, 2001, Woodman finalized a second search warrant affidavit for Stewart's residence. Govt. Ex. 2A. Among other information, Woodman's statement of probable cause included the items seized in the June 18 search of Defendant's home, information from Creamer and York that they had both seen Stewart in possession of cocaine during the weeks of July 2 and July 9, and that York had seen two ounces of cocaine in various places in his residence. Govt. Ex. 2A. Woodman then submitted his affidavit in support of a second search warrant of Defendant's residence. Govt. Ex. 2A. Based on Woodman's affidavit, another Maine District Court judge issued a search warrant permitting officers to search Defendant's residence.[11] Govt.

---

**11.** From Woodman's affidavit, it appears that the agents applied, at least in part, for the second search warrant for Defendant's home to retrieve a digital camera the agents be-

lieved they left in Defendant's home while executing the first search warrant. Govt. Ex. 2B.

Ex. 2B. The agents executed that search warrant on July 12, 2001. Govt. Ex. 2C.

### B. Analysis

Defendant argues that the fruits of the July 12, 2001, search should be suppressed because the Government failed to include the information regarding York's drug charges in Rhode Island and information regarding York's unauthorized presence at the June search of Defendant's residence wherein she was in possession of cocaine. The Government responds that Defendant has not established that the evidence was intentionally or recklessly omitted. In the alternative, the Government argues that even if the Court finds that the information was intentionally or recklessly omitted and should have been included in Agent Woodman's affidavit, the inclusion of such evidence would not have made a difference to the probable cause determination. As stated above, under *Franks,* the Court must first determine if a statement is intentionally or recklessly omitted.

### 1. York's Rhode Island Drug Arrest

Woodman became aware of York's Rhode Island arrest sometime after the first search warrant was executed, but before the second search. Tr. 1 at 131. Like Pease, when Woodman heard about York's Rhode Island charges, he had nothing in writing to corroborate that information.[12] Tr. 1 at 131. Nevertheless, this information plainly bears on York's reliability as a cooperating informant and, thus, it should have been included in Woodman's July affidavit. The Court finds that this information was recklessly omitted from Woodman's affidavit.

### 2. York's Presence at Stewart's Residence and Possession of Cocaine

When Woodman and the other agents executed the search warrant on Stewart's house on June 18, they found York inside. Tr. 1 at 52. The agents had not given York permission to have contact with Stewart on June 18, and such contact violated the terms of her confidential informant agreement with MDEA. Tr. 1 at 52. In addition, York was in possession of one gram of cocaine, but denied that the cocaine belonged to her. Tr. 1 at 52. Although MDEA ended York's participation as an active informant to purchase cocaine, the agents continued to receive drug information from York when she provided it. Tr. 1 at 52–53. Woodman included York's information in the second search warrant affidavit, omitting, however, the information about York's violation of her cooperation agreement and possession of cocaine. Tr. 1 at 54. For his part, Woodman explained that he failed to include the information about York's presence because he believed that it only corroborated the other information tending to show that Stewart was still actively participating in cocaine trafficking. Tr. 1 at 110.

Nomani testified that she was aware that York was found in possession of cocaine at Stewart's residence during the execution of the first search warrant. Tr. 2 at 22–24; Tr. 1 at 135. In fact, Nomani had a discussion with Connick about whether to include this information about York in the affidavit, and Nomani told Connick that the information did not need to be included. Tr. 2 at 23–24. Connick, who again reviewed Woodman's July affidavit in his supervisory capacity and was aware that York had been found at Stewart's house in possession of cocaine, ex-

---

12. Although MDEA apparently ran a criminal history check of York prior to her cooperation in this case, the first criminal history report did not show York's Rhode Island arrest on drug charges. Tr. 1 at 131–32.

plained his decision not to include the bad information as follows:

All of the people, myself, Agent Woodman and the attorney general was [sic] aware of the fact of her being present with cocaine. It was sort of a situation that cut both ways as far as I was concerned. It was valuable on one side of cocaine being there and the apparent distribution of cocaine at the Stewart residence, certainly the other side of that was her being there herself and violating the agreement, in hindsight, without question I should have instructed Agent Woodman to put that information in there.

Tr. 1 at 54.

██ York's unauthorized presence at Stewart's home on June 18, in possession of cocaine, should have been included in Woodman's search warrant affidavit. As Connick put it, it was information "that cut both ways," thus, it clearly should have been made available to the judicial officer who would make the probable cause determination. If information gained from a cooperating individual is included in a search warrant application, any evidence regarding that cooperating individual's unplanned contact with law enforcement personnel should also be included in the affidavit. The omission of this information is most troubling to the Court. In light of the explanations regarding the omission of this information from the affidavit, the Court finds that the omissions were intentional.

**3. Probable Cause in July Search Warrant Application**

██ Defendant argues that Woodman's affidavit is fatally flawed because it does not provide any corroboration for either the reliability of the informant or the basis for the informant's information. The Government responds that even with the inclusion of the negative facts about Creamer and York, the information in the first search warrant affidavit is sufficiently corroborated to establish the reliability of the informants and supports the issuance of the search warrant. Under the *Franks* standard, Defendant must show that the omission of the information about York was material to the existence of probable cause. *See Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85. Based on the evidence presented at the hearing, the Court concludes that even if the information were to have been included in Woodman's July 12 affidavit, probable cause still existed to justify the issuance of the search warrant.

Woodman's July affidavit disclosed that Creamer had been arrested on drug trafficking and felon in possession of a firearm charges, and that he hoped to receive a benefit for his cooperation, but was told that the agents could promise no benefit. Govt. Ex. 2A. The affidavit states that Creamer was present in Stewart's home on July 3, 4, and 6, and that he saw cocaine there on each of those dates. Govt. Ex. 2A. With respect to York, the affidavit discloses that she had been charged with drug possession and hoped to receive a benefit for her cooperation, but was told that no benefit could be promised by the agents. Govt. Ex. 2A. The affidavit provides that York was at Stewart's home on July 9 and was told by Stewart that he had twenty ounces of cocaine and some hashish. Govt. Ex. 2A. The affidavit also states that York saw cocaine at Stewart's house on another occasion within a week prior to July 11. Govt. Ex. 2A. York provided the agents with detailed information about the location of one pound of Defendant's hashish. On one of York's visits to Defendant's home, Defendant advised her that he expected the agents to execute another search of his residence in order to retrieve a digital camera that the agents left in his home after the June 18 search. York re-

ported seeing the camera and its case in Defendant's home. In anticipation of another search, York told the agents that Defendant had "the cocaine . . . wrapped in a wet nap [sic] that had been soaked in chlorine and then placed in a baggie . . . so that a certified drug dog would not be able to detect the cocaine." Govt. Ex. 2A ¶ 8. Finally, the affidavit provided that on June 18, 2001, Stewart was arrested in possession of seventeen ounces of cocaine and $27,546 in cash. Govt. Ex. 2A.

First, in assessing whether probable cause exists to believe that a search of an individual's home will reveal evidence of a particular crime, a magistrate may consider the individual's known prior criminal conduct. See Taylor, 985 F.2d at 6; see also United States v. Asselin, 775 F.2d 445, 446 (1st Cir.1985). Here, the affidavit indicated that Defendant was caught three weeks previously with over a pound of cocaine and a large amount of cash. This information is relevant in determining whether it was probable that he possessed drugs in his home at the time the warrant issued.

The affidavit also included information provided by the two confidential informants—Creamer and York. All of the information in the second affidavit provided by Creamer, and most of the information provided by York, regarding the presence of drugs at Defendant's home was based on personal observation. York's knowledge that the agents had left a digital camera at Defendant's home after the June search, together with the detailed recitation of the safeguards Defendant had taken to prevent detection of his cocaine when the agents returned, is compelling evidence that York's information provided a reliable basis for knowing that Defendant continued to traffic in cocaine. In addition to the indicia of authenticity provided by York's basis of knowledge and detailed information, circumstances exter-

nal to York's statements lend the information additional weight. That is, Creamer corroborated York's contemporaneously detailed information that Defendant was still engaged in trafficking cocaine. Courts often have held that consistency between the reports of two independent informants serves to corroborate both accounts. See, e.g., United States v. Fields, 72 F.3d 1200, 1214 (5th Cir.1996). Given the specific, first-hand information from York and Creamer that was included in Woodman's affidavit regarding Stewart's continued drug trafficking operation, the additional information concerning York's additional criminal history and her misconduct, had it been made known to the reviewing judge, would not have undermined the existence of probable cause. As with the first warrant, the evidence supporting the second search warrant was sufficient such that the inclusion of the information bearing on York's credibility would have made no practical difference to the probable cause determination.

Accordingly, it is **ORDERED** that Defendant's Motion to Suppress be, and it is hereby, **DENIED**.